## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
**LORRAINE FORCIER, Administrator**       )
**of the Estate of Darren Forcier,**      )
                                          )
    **Plaintiff/Counterclaim Defendant,**  )    **Civil Action No.**
                                          )    **04-40158-FDS**
    **v.**                            )
                                          )
**DORIS FORCIER,**                        )
                                          )
    **Defendant/Counterclaim Plaintiff.**  )
_____)

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**SAYLOR, J.**

This is a dispute about the proceeds of a life insurance policy, arising under the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

The facts of this case are somewhat unusual. Darren and Doris Forcier were married in

May 2000. Their marriage was both childless and unsuccessful; Doris filed for divorce less than

two years later, in April 2002. The parties entered into a separation agreement in July 2003 that

included an apparently final financial separation. A judgment of divorce nisi under Massachusetts

law was then entered on October 6, 2003, with an "absolute" (that is, effective) date of January 5,

2004. Fifteen days later, on October 21, Darren committed suicide. Because the divorce never

became final, Doris remained Darren's spouse at the time of his death.

As a benefit of his employment, Darren was covered by a group term life insurance policy

issued by Metropolitan Life Insurance Company ("MetLife"). For reasons that are not known,

Darren never designated a beneficiary. The policy states that where no beneficiary has been

named, MetLife will pay the benefits "to one or more of the following persons who survive you:

1. spouse; 2. child; 3. parent; 4. brother or sister." It then provides, "However, we may instead pay all or part of that amount to your estate."

The death benefit totals $208,000. Both Doris (Darren's spouse) and Lorraine Forcier (Darren's mother and administrator of his estate) claim the right to the proceeds. Although Lorraine submitted a claim as administrator, she did not request that the benefits be paid to the estate, but instead directly, in equal portions, to herself, Darren's father, and Darren's sister.

MetLife did not make a decision as to whom should receive the policy benefits. Instead, it filed an interpleader action, and then moved for leave to pay the money into this Court and be dismissed. The Court granted that request, leaving Doris Forcier and Lorraine Forcier as the only litigants in this proceeding.

The Court conducted a bench trial on September 8, 2005. It heard no witnesses; instead, the parties submitted the case on a joint stipulation of facts with eleven exhibits. Pursuant to Fed. R. Civ. P. 52(a), the Court's findings of fact and conclusions of law are set forth below.

In summary, the Court has concluded that the policy creates a permissive, but not mandatory, hierarchy of beneficiaries where the insured failed to make a beneficiary designation. According to that hierarchy, the proceeds should ordinarily be paid to the spouse, absent extraordinary circumstances. It is undisputed that Doris Forcier was the lawful spouse, and is now the widow, of Darren Forcier. These circumstances are, however, anything but ordinary. Accordingly, and in the absence of any children, the Court will order that the benefits be paid under the policy in equal portions to Darren's parents, Lorraine Forcier and Donald Forcier.

2

## I.    Findings of Fact

### A.    The Marriage

Darren Forcier and Doris Forcier were married on May 20, 2000, in Holden, Massachusetts.  They had no children.  According to the Complaint For Divorce, their marriage began to break down on or about May 27, 2000, only seven days after the wedding.  (Exhibit B). They nonetheless continued to reside together until May 29, 2002.  *Id.*

On April 11, 2002, Doris filed a Complaint for Divorce in Worcester Probate and Family Court, alleging irretrievable breakdown of the marriage.[1]  They had been married at that point for less than two years.

### B.    The Separation Agreement

On July 2, 2003, Darren and Doris executed a Separation Agreement.  The preamble to the Separation Agreement states the following:

This Agreement is made in order to settle and determine:

A. The property rights of each of the parties;

B.  Whether and to what extent all or any part of the estate of the Husband or Wife should be assigned to the other in consideration of the provisions of [Mass. Gen. Laws ch.] 208 sec. 34;

C.  All other rights and obligations arising from the marital relationship; [and]

D.  All other matters which should be settled in view of the existing divorce complaint[.]

The Separation Agreement went on to provide, among other things, for the division of

---

[1] The parties have stipulated that Doris's attorney filed a Notice of Withdrawal in the divorce action on November 13, 2002.  It is unclear what the Court is to derive from that fact, other than the fact that Doris appears to have proceeded *pro se* from that point forward.

marital property.  The parties acknowledge that Doris conveyed her interest in the marital home

to Darren in return for a cash payment of $15,000; further acknowledged that they divided their

personal property; and agreed to be responsible for certain debts in their own names.

With regard to life insurance, the Separation Agreement states as follows:

8.  Life Insurance:

The Husband and the Wife shall keep in force life insurance policies as they see fit.

There is no evidence of any life insurance policy other than the policy at issue here.  There is no

evidence that the parties were aware of, or in any way considered, the life insurance benefit

provided to Darren through his employer.  In contrast, the Separation Agreement provides the

following as to medical and dental insurance:

> The Husband shall maintain in full force and effect the existing medical health
> insurance coverage for the benefit of the Wife, as long as it is a benefit of his
> employment and as long as she is eligible under the terms of the existing policy, at
> no further additional cost or premium to the Husband. . . .

*Id*.

Paragraph 22 of the Agreement provides in its entirety as follows:

22.  Waiver of Estate Claim:

Except as otherwise provided in this Agreement, each party hereby waives and
releases any and all rights that he or she may now have or hereafter acquire as
spouse under the present or future laws of any jurisdiction:

> A.  To elect to take against any will or codicil of the other party now on or
> thereafter in force;

> B.  To share in the party's estate in case of intestacy; and;

> C.  To act as executor administrator [*sic*] of the other party's estate.  It is
> the intention of the parties that their respective estates shall be administered as
> though no marriage between them had ever existed.  However, nothing in this

paragraph is intended to or shall constitute a waiver by either party of any testamentary provisions which the other may voluntarily make for him or her or a waiver of the Wife's rights against Husband's estate, if any, under Article 8 [*sic*]. The provisions of Clause [*sic*] shall not take effect until the final date of the divorce decree.

Finally, the Separation Agreement contains specific acknowledgments that both parties had "fully and completely described and disclosed his or her income [and] assets," and that the property referred to in the Separation Agreement "represents all property which either party has any interest in or right to, whether legal or equitable, owned in full or in party [*sic*] by either party, separately or by the parties jointly."  *Id.*

There is no evidence that Darren was aware of, and fraudulently failed to disclose to Doris, the existence of the life insurance benefit.  There is also no evidence that either Darren or Doris breached the agreement prior to Darren's death or at any time thereafter.

C.     **The Divorce Judgment and the Death of Darren Forcier**

The Separation Agreement was presented to Worcester Probate and Family Court on October 6, 2003.  The presiding judge found that the agreement was voluntary, that it was fair and reasonable, that both parties accepted the agreement "as a full and final division of marital assets," and that the agreement made proper provisions for the division of marital property.  *Id.*

A judgment of divorce nisi was entered the same day, October 6, 2003, with an absolute date of January 5, 2004.  (Exhibit D).   The divorce would thus become final after the passage of three months' time.  Under Massachusetts law, no further action was required—not even a ministerial action.  *See* Mass. Gen. Laws ch. 208, § 21.

Fifteen days later, on October 21, 2003, Darren committed suicide.  (Exhibit E).  He was then 38 years old.

5

Because Darren died before the expiration of the nisi period, the divorce never became

final.  There is no evidence of any attempt at marital reconciliation at any time prior to Darren's

death.

### D.   The Life Insurance Policy and Benefit

At the time of his death, Darren was employed by Macromedia, Inc., as a software

engineer.  As an employment benefit, Darren was covered by a group term life insurance policy

issued by MetLife.[2]  The death benefit was "[a]n amount equal to 2 times [his] basic annual

earnings, as determined by [his] Employer, rounded to the nearest $1,000."  The amount of that

benefit, at the time of his suicide, was $208,000.[3]

There is no written beneficiary designation on file either with Darren's employer or with

MetLife.  The policy contains a clause entitled "No Beneficiary at Your Death," which provides:

> If there is no Beneficiary at your death for any amount of benefits payable because
> of your death, that amount will be paid to one or more of the following persons
> who survive you:
>
> 1. spouse;                          3. parent;
> 2. child;                           4. brother or sister.
>
> However, we may instead pay all or part of that amount to your estate.[4]
>
> Any payment will discharge our liability for the amount so paid.

(Exhibit F).

_____

[2] The policy provides that the plan administrator is Macromedia.  However, it appears that claims were
administered by MetLife, and clearly all discretionary acts and omissions relevant to this action were assigned to,
or made by, MetLife.  Accordingly, and for the sake of simplicity, this opinion will simply refer to MetLife as the
"insurer."

[3] The policy offered both a Basic Life Benefit and an Optional Life Benefit; Darren did not elect the latter.
The only suicide exclusion applied to the payment of certain Optional Life Benefits.

[4] The policy states that references to "we," "us," and "our" means MetLife.

The policy vests in MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." *Id*. It also states that "[a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." *Id.*

### E.    Proceedings in the Probate Court

Darren died intestate. On November 8, 2003, Lorraine Forcier (Darren's mother) filed a Petition for Administration of Darren's estate in the Worcester Probate and Family Court. The Petition for Administration listed four "heirs at law or next of kin of deceased": Lorraine; Donald Forcier (Darren's father, who is divorced from Lorraine); Dionne Waterman (Darren's sister, an adult); and Doris Forcier.

On February 8, 2004, Doris filed an objection to Lorraine's appointment as administrator. Two days later, Lorraine filed a "motion for instructions" with the Probate and Family Court seeking the Court's instruction as to the enforceability of the Separation Agreement with respect to Doris's waiver of her right to become administrator of the estate. (Exhibit G). On February 26, the Probate and Family Court ruled that the Separation Agreement was in full force and effect from the date of the court's order approving it, and that Doris "waived her rights in the estate" and "waived her right to act as the administrator of his estate." (Exhibit H). Lorraine was then appointed Administrator of the estate on April 13, 2004. (Exhibit I).

### F.    The Competing Claims for Benefits

Lorraine submitted a "letter of instruction" to MetLife on May 1, 2004, stating, in part, that "[a]s Administratrix, [she is] requesting that the proceeds be equally distributed to the

7

decedent's mother, father and sister as listed on [the] claim form" and that "any checks be sent to [her] attention for distribution." (Exhibit J). Attached to the letter was a completed MetLife "Claimant's Affidavit." In it, Lorraine listed herself as the "Claimant," and stated that her "Relationship to the Insured" is "Mother, Administratrix of Estate." (Exhibit J). In the sections of the form requesting information about Darren's family members, she listed Darren's father and sister and provided their addresses, social security numbers, and dates of birth.

On June 24, 2004, Doris submitted a claim to MetLife requesting that the insurance proceeds be distributed to her as spouse. (Exhibit K).

MetLife did not decide to whom the policy benefits should be paid; instead, and as set forth below, it left it to the parties to litigate their competing claims.

## II. __Procedural Background__

On July 21, 2004, Lorraine filed a complaint in the Worcester Probate and Family Court against MetLife and Doris. The original complaint sought reformation of the life insurance policy and requested that the proceeds be paid to Darren's estate rather than to Doris. At Lorraine's request, the Probate Court temporarily restrained and then preliminarily enjoined MetLife from disbursing the proceeds of the policy.

On August 17, 2004, MetLife filed a motion requesting that it be granted leave to deposit money with the court, that all claims against it be dismissed, and that it recover its attorneys' fees and costs. In that motion, MetLife represented that it does not have an independent interest as to how the conflicting claims for the Policy benefits are resolved.

On August 19, 2004, Doris Forcier filed a motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6), arguing that reformation of the Policy is not warranted because the separation

agreement does not apply to the Policy.  On that same day, MetLife filed a notice of removal in this Court, asserting federal jurisdiction under ERISA.  After removal, Doris Forcier resubmitted her motion to dismiss in this Court.

On September 7, 2004, Lorraine filed a motion for leave to amend her complaint.  In her amended complaint, she no longer requested reformation of the policy, but instead sought a declaratory judgment instructing MetLife to pay the proceeds into "the Estate of Darren Forcier and not to decedent's spouse, Doris Forcier."  MetLife answered the amended complaint and filed a counterclaim and cross-claim for interpleader.  MetLife admitted liability and requested that it be allowed to deposit the proceeds with the Court and that the Court dismiss it from the action. In support of this request, MetLife alleged, among other things, that it had received conflicting claims, did not have an independent interest in how the claims were resolved, and was in "doubt as to the proper beneficiaries under the Plan."

Lorraine answered MetLife's counterclaim for interpleader and admitted that MetLife should be allowed to deposit the proceeds with the Court.  Doris did not respond to the interpleader cross-claim.

By order of March 16, 2005, the Court allowed Lorraine's motion to amend the complaint, denied Doris's motion to dismiss, granted MetLife's request to pay the proceeds into the Court, and dismissed MetLife as a party.  MetLife thereafter, with the agreement of all parties, moved for an award of approximately $5,000 in attorneys' fees and costs from the proceeds.  The Court granted the motion.

On April 8, 2005, Doris filed an answer and counterclaim for declaratory judgment in her favor, contending that she was entitled to the proceeds as the lawful spouse at the time of

Darren's death.

The parties agreed to proceed by bench trial, which the Court held on September 8, 2005.[5]
The only facts submitted to the Court for consideration were those contained in a joint stipulation,
with exhibits.[6]  No witnesses were called for either party.

## III.    Conclusions of Law

### A.    General Principles:  ERISA and the Application of Federal Common Law

ERISA is a comprehensive statute that establishes rights and duties concerning certain
employee benefit plans, including the administration and payment of benefit claims.  The insurance
benefit at issue in this case meets the statutory definition of an "employee welfare benefit plan"
under ERISA.  *See* 29 U.S.C. § 1002(1); *Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d 857, 860-
61 (4th Cir. 1998).  Plainly, "[i]nsurance coverage which is part of an ERISA plan is regulated
under ERISA," and the policy involved in this case is no exception.  *See Wickman v.
Northwestern National Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990).

Although it is a "comprehensive and reticulated" statute, ERISA does not set forth a
specific rule governing every issue that might arise in the administration and enforcement of rights
under employee benefit plans.  *See, e.g., Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101,
108-109 (1989) (ERISA silent as to appropriate standard of review of the insurer's denial of

---

[5] The matter was originally scheduled as a bench trial; however, as noted, the parties stipulated as to the
facts and did not call any witnesses.  The Court inquired of the parties whether the proceeding should be deemed to
be an argument on cross-motions for summary judgment:  both indicated, in substance, that it would have no
practical effect either way.  Although the Court was originally inclined to convert this matter into a summary
judgment proceeding, it will instead accept the parties' original characterization.  This opinion therefore will
constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).

[6] At the request of the Court, the parties also submitted post-trial filings indicating, in substance, that
there would be no estate tax consequences regardless of how the Court framed its ultimate award.

10

benefits).  Where no specific provision under ERISA is applicable, courts must apply or create

federal common law to resolve the dispute.  *Id.* at 109, 111-113 (where ERISA was silent and

otherwise relevant state law was preempted, the court developed federal common law to

determine appropriate standard of review of a fiduciary's denial of benefits under the ERISA-

covered plan); *Metropolitan Life Ins. Co. v. Flinkstrom*, 303 F. Supp. 2d 34, 40 (D. Mass. 2004)

(where no specific provision of ERISA governed a spousal waiver of beneficiary interests in an

insurance policy, and state law concerning the effect of an agreement made as a part of a divorce

decree was preempted, the court applied federal common law).

Where federal common law is silent or not fully formed with respect to an issue, it may be

appropriate to borrow from state law principles in fashioning the federal common law.  *Firestone*

*Tire*, 489 U.S. at 111 (considering state law of trusts); *Wickman*, 908 F.2d at 1084 (considering

state law principles of insurance contract interpretation).  In so doing, the court does not directly

apply state law.  *See Morais v. Central Beverage Corp. Union Employees' Supplemental*

*Retirement Plan*, 167 F.3d 709, 711-12 (1st Cir. 1999) (while state law principles may be

reflected in the federal common law, state law is itself preempted in the context of interpreting an

ERISA-covered plan).  Rather, it considers whether common-sense state law principles serve "the

spirit of ERISA in promoting fair and equitable settlements of claims, as well as in promoting the

formation of employee benefit plans."  *Wickman*, 908 F.2d at 1085.

The principal question before the Court is to whom the life insurance proceeds are to be

paid.  In order to answer that question, the Court must address the following issues, among

others:  (1) whether the insurer should be required to select the appropriate beneficiary in the first

instance, instead of the Court; (2) if the Court is the appropriate decision-maker, whether the

ERISA statute itself mandates a particular result; and (3) if not, whether the policy mandates or permits a particular result.

**B.    The Insurer's Failure to Resolve the Dispute**

As noted, the policy vests in MetLife "discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan." Furthermore, under the policy, "[a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious."

MetLife declined to exercise that discretion, and instead filed an interpleader action requesting, in effect, that the Court make that decision in its stead.[7] Had MetLife made that decision, and had the losing party filed suit, the Court would be required to defer to MetLife's choice as long as it exercised its discretion rationally. *See Firestone Tire*, 489 U.S. at 115; *Madera v. Marsh USA, Inc.*, 426 F.3d 56, 63-64 (1st Cir. 2005). The Court is thus faced with the threshold question whether it, rather than MetLife, should make the decision in the first instance.

Ordinarily, claimants seeking benefits under ERISA plans are required to exhaust their administrative remedies under the plan before seeking judicial relief, unless that process would be futile or would not provide an adequate remedy. *See Drinkwater v. Metropolitan Life Ins. Co.*, 846 F.2d 821, 825-26 (1st Cir. 1988). Arguably, at least, the inverse should be true: absent good

---

[7] As a defendant insurer faced with competing claimants to the proceeds of a life insurance policy, MetLife had standing to claim interpleader. *See* Fed. R. Civ. P. 22; *Phoenix Mutual Life Ins. Co. v. Adams*, 30 F.3d 554, 556 (4th Cir. 1994) (interpleader action under ERISA to determine proper recipient of proceeds of a death benefit); *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 879 F.2d 249, 250 (7th Cir. 1989) (same).

cause, insurers or plan administrators with discretionary power under ERISA plans should be required to exercise that discretion, and make a decision, before seeking judicial relief.

At least one federal court, faced with a similar set of circumstances, has ordered precisely such a remedy. In *Life Insurance Co. of North America v. Nears*, 926 F. Supp. 86 (W.D. La. 1996), the decedent was covered by two group term life insurance policies that had been issued to her employer. She died without designating a beneficiary for either policy, and her surviving spouse and children from a previous marriage both made claims to the proceeds. The insurer filed an interpleader action in federal court rather than render a decision. The court noted that one of the policies contained a "facility of payment" clause providing that "when there is no named beneficiary the plan administrator is vested with discretion to pay benefits to any of [the] insured's living relatives as he sees fit." *Id.* at 89.[8]   It then concluded:

> Put simply, this policy does not rank the classes of relatives in any order or preference in the event there is no surviving named beneficiary, but leaves the decision of choosing a beneficiary to the plan administrator.
>
> We anticipate that [the insurer's] administrator may experience some discomfort in making this decision, and we acknowledge that it was this very discomfort that must have led [the insurer] at least to file this action seeking to have the court decide in its stead. The court, however, declines to impose its subjective preference in this determination where the insurer has clearly contracted for the discretion to exercise its own judgment.

*Id.*

This "reverse exhaustion" approach has considerable superficial appeal. Here, as in *Nears*,

---

[8] The actual language of the policy provided as follows:

> Any amount of your loss of life benefits for which there is no designated or surviving beneficiary will be paid, at [the insurer's] option, to any of your following living relatives: spouse, mother, father, child, or children, or to the executors or administrators of your estate.

*Id.*

the insurer arguably seeks to have this Court make a decision that it contracted to make, under a policy that it wrote and that it administers. This Court is no better equipped, and indeed in many ways more poorly suited, to make that decision than the insurer. In one sense, the Court is being asked to step into the shoes of the insurer; the wisdom of substituting a district court for the insurer in this context is not at all obvious, and indeed such a procedure may impede cost-effective plan administration. *Cf. Donatelli v. Home Insurance Co.*, 992 F.2d 763, 765 (8th Cir. 1993) (in context of judicial review of plan administrator's decision); *Lane v. Director of Employee Benefits, Gannett Co.*, 253 F. Supp. 2d 57, 63 (D. Mass. 2003) (same).[9]

Nonetheless, the Court declines to follow that path here. While "reverse exhaustion" is generally preferable—at least under circumstances where the insurer needs only to ascertain the facts and exercise its discretion rationally in accordance with the terms of the policy in order to render its decision—it does not appear to be mandatory.[10] It is true, of course, that there is a natural human tendency to try to avoid making difficult decisions, and it is therefore possible that insurers may abuse the device of interpleader if not forced to render decisions themselves. Nonetheless, interpleader serves a valuable function. *See Equitable Life Assurance Soc'y of the United States v. Crysler*, 66 F.3d 944, 947 (8th Cir. 1995) (observing that interpleader actions

---

[9] *See Egelhoff v. Egelhoff*, 532 U.S. 141, 149 n.3 (2001) (The "costs of delay and uncertainty" brought about by a state law that would have allowed a plan administrator to avoid resolving the dispute himself and to let courts or parties settle the matter would "thwart[] ERISA's objective of efficient plan administration.").

[10] There is some authority for the proposition that the clause at issue is a "facility of payment" clause that is waivable by MetLife. Such a waiver would be permissible because such clauses are intended for the protection of the insurer. 4 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE, §§ 61:14, 61:15 (3d ed. 2005) ("Nor is the insurer bound to exercise its right under the facility of payment clause. If it so desires, it may refuse to seek to determine who is equitably entitled and instead pay the money into the court . . . [which would be] a waiver of the right to elect thereunder."). Whether the clause here has the same meaning and effect under ERISA is not clear, and the Court does not rest its decision on that basis.

prior to the advent of ERISA promoted "the fair resolution of conflicting, non-frivolous claims to plan benefits"); *Manitowoc Engineering Co. Salaried Employees' Deferred Profit-Sharing Plan v. Powalisz*, 1986 WL 2605, at \*4-5 (E.D. Wis. Feb. 12, 1986) (under circumstances of case, including interpretation of newly-enacted statute, requiring reverse exhaustion would serve no purpose "[u]nless it could be established that the [plan administrators] were totally and completely abrogating their duties under the plan"); *see also U.S. Trust Co. of New York v. Alpert*, 10 F. Supp. 2d 290, 306-07 (S.D.N.Y. 1998) (non-ERISA case; no breach of fiduciary duty by trustees of investment trusts who invoke interpleader procedure rather than interpreting relevant indenture). Furthermore, insurers with discretion to make benefits decisions have a fiduciary duty to participants and beneficiaries to act in their interests in accordance with the plan documents, and that duty, coupled with the discretionary power of the courts to refuse to permit interpleader dismissals, appears to be sufficient to deter potential abuses.

The matter is thus within the Court's discretion, and at least two practical considerations militate against an order requiring "reverse exhaustion" here. First, no party to this litigation has requested such relief. Neither of the claimants objected to the interpleader proceeding, nor to the dismissal of the insurer from this action. Both thus wish to have this Court, for better or worse, render the decision. While those desires are not controlling, they certainly weigh in favor of keeping the matter here rather than returning it to the insurer. Second, if the Court were to require the insurer to make the decision, it would by no means end this dispute, and in all likelihood would prolong it. No matter which party was successful, it is likely that the disappointed party would file suit, challenging MetLife's interpretation of and decision under the policy, and possibly the meaning and effect of the Separation Agreement on that decision. The

15

Court is reluctant to require the parties to expend additional attorneys' fees and resources on this matter in the absence of a compelling reason to do so.

Accordingly, rather than prolonging this dispute unnecessarily, the Court will proceed to decide it. Whether it would make the same decision on a different set of facts is a question for another day.

### C.    <u>The Language of ERISA</u>

The Court must begin its analysis with the language of ERISA itself. The text of ERISA provides that "a fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). Among other things, that includes making payments where appropriate to the beneficiary "designated by a participant, or by the terms of [the] plan." 29 U.S.C. § 1002(8). Therefore, the Court should consider first what the "terms of [the] plan" require. Because the policy is the only plan document offered in evidence, the Court will rest its decision on the meaning of the policy language. *See Morais*, 167 F.3d at 713 (considering first the unambiguous language of the policy).

### D.    <u>The Language of the Policy</u>

The Court must accord the "natural meaning" to the "straightforward language in an ERISA-regulated insurance policy." *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486, 489 (1st Cir. 1989); *see also* COUCH ON INSURANCE, § 58:4 ("The rights of contending parties to the proceeds of an insurance policy, each claiming to be the lawful beneficiary thereof are . . . determined by a construction and interpretation of the contract itself."). The Court must also employ a "common-sense" approach to the interpretation of the policy. *See Morais*, 167

F.3d at 712.

> As set forth above, the policy provides:
>
> If there is no Beneficiary at your death for any amount of benefits payable because of your death, that amount will be paid to one or more of the following persons who survive you:
>
> 1. spouse;          3. parent;
> 2. child;           4. brother or sister.
>
> However, we may instead pay all or part of that amount to your estate.

No extrinsic evidence has been offered as to its meaning, and thus there is no issue of parol evidence; only the policy itself is before the Court.[11]

Doris contends that the policy creates a strict hierarchy of beneficiaries, and that in the event of a failure to designate a beneficiary the proceeds should be paid in the numerical order designated. She further contends that the Federal Employees Group Life Insurance Act, ("FEGLIA"), 5 U.S.C. § 8701, *et seq.*, reflects a clear congressional policy favoring the same

---

[11] There is little by way of federal common law to guide the Court's decision. Federal cases concerning the claims of competing beneficiaries have arisen primarily in two contexts: (1) where the decedent attempted unsuccessfully to change the named beneficiary; and (2) where the named beneficiary waived his or her rights to ERISA benefits through an agreement in connection with a divorce. Neither of these lines of cases are dispositive or even particularly instructive.

As to the former, as a general matter, an expression of intent to change a beneficiary will be effective only if there is sufficient evidence of intent to make such a change and that the insured actually took some positive action to make his or her intent effective. *See, e.g., Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 566 (7th Cir. 2002) (attempted change of beneficiary after divorce held ineffective); *Prudential Ins. Co. v. Schmid*, 337 F. Supp. 2d 325, 330 (D. Mass. 2004) (evidence insufficient that insured took any positive steps to effect a change of beneficiary). As discussed below, under any conceivable interpretation of the evidence, the Court cannot conclude that Darren attempted to name a beneficiary, or that he even gave any thought to whom the proceeds of the policy should be paid.

As to the latter, a waiver of benefits under an ERISA welfare plan generally will be effective if knowing and voluntary. *Morais*, 167 F.3d at 713; *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 587 (1st Cir. 1993); *Flinkstrom*, 303 F. Supp. 2d at 41. The Separation Agreement does not even mention the existence of the life insurance benefit, and it is therefore doubtful whether Doris made a knowing and voluntary waiver of that benefit. The Court does not, however, need to reach that issue here.

hierarchical order.[12]  Lorraine, by contrast, contends that the policy permits payment to any of the named recipients in the discretion of the insurer, and that the equities disfavor payment to Doris under the circumstances of this case.

### 1.    Whether the Language Imposes a Strict Hierarchy

The principal evidence cited by Doris in favor of her "strict hierarchy" argument is the fact that the policy lists classes of beneficiaries in a numerical order.  If the insurer were free to pay the benefits to any named party, the argument goes, there would be no point in numbering the different classes of beneficiaries.

The Court disagrees with that interpretation.  It would have been a simple enough task to draft the language to create a strict or mandatory hierarchy, if that is what was intended.  *See, e.g.*, *O'Neal v. Central States, Southeast and Southwest Areas Pension Fund*, 378 F. Supp. 2d 1370, 1374 (N.D. Ga. 2005) (policy provided that, in absence of a named beneficiary, benefits would be "payable to the first surviving class in the following order: (1) spouse; (2) children, in equal shares; (3) parents, in equal shares; (4) siblings, in equal shares; and (5) estate"); *Nears*, 926 F. Supp. at 89 (in absence of named beneficiary, facility of payment clause provided that benefits "will be paid . . . to the first surviving class of the following classes of beneficiaries: (a) wife or husband (b) child or children (c) mother or father (d) sisters or brothers").

Here, the policy contains no mandatory language of any kind, and there is no clearly defined conditional sequence (e.g., "if not to x then to y").  Instead, the language of the policy

---

[12]    Doris also argues that the ordering of the classes is not random, but generally tracks the order under common law (and, generally, state law) in which each class would inherit property under state law when a decedent dies intestate.  *See, e.g.*, Mass. Gen. Laws ch. 190, § 1 *et seq.* (generally, to spouse, then to issue, then to kindred).  It is true that the order is the same.  That point, however, seems to cut against Doris's argument, for it illustrates not only the ease with which a mandatory hierarchy might be drafted, but also the likely awareness of the drafters of the policy of the strictly hierarchical nature of intestate distribution under state law.

simply states that the insurer may pay the proceeds to "one or more of the following persons who survive you" (or, alternatively, it may pay "all or part" of the proceeds to the estate). The Court therefore concludes that the policy language is not mandatory, and does not impose a strict hierarchy of beneficiaries.

## 2.    The Relevance of FEGLIA

Doris further contends that FEGLIA is an expression of Congressional policy to which this Court must give deference in interpreting the policy language here.   The Court disagrees.

FEGLIA creates, by statute, a life insurance benefit for federal government employees.  It contains a clear statutory command as to how life insurance proceeds should be paid to employees who die without designating a beneficiary. *See* 5 U.S.C. § 8705(a).[13]  That statutory directive has been applied strictly, even in the presence of strong countervailing equitable considerations. *See, e.g., Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 121 (6th Cir. 1982) (proceeds paid to

---

[13]    The statute provides:

(a) . . . [T]he amount of group life insurance and group accidental death insurance in force on an employee at the date of his death shall be paid, on the establishment of a valid claim, to the person or persons surviving at the date of his death, in the following order of precedence:

First, to the beneficiary or beneficiaries designated by the employee . . . .

Second, if there is no designated beneficiary, to the widow or widower of the employee.

Third, if none of the above, to the child or children of the employee and descendants of deceased children by representation.

Fourth, if none of the above, to the parents of the employee or the survivor of them.

Fifth, if none of the above, to the duly appointed executor or administrator of the estate of the employee.

Sixth, if none of the above, to other next of kin of the employee entitled under the laws of the domicile of the employee at the date of his death.

second wife as "widow," notwithstanding the fact that the deceased had separated from her, moved back in with his first wife, and clearly intended the proceeds to pay for the education of his son by his first wife).

There is no reason to suppose, however, that Congress intended the FEGLIA statute to be imported wholesale into the ERISA scheme. For one thing, ERISA contains no similar provision; it would have been easy enough to insert one, if that had been Congress's intention. For another, the FEGLIA statute is at odds, at least in this context, with the provision in ERISA requiring that the insurer "discharge [its] duties with respect to a plan . . . in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). As noted above, the policy here permits the insurer to exercise discretion in the payment of proceeds, whereas no such discretion is permitted under FEGLIA.

*Rollins v. Metropolitan Life Ins. Co.*, 863 F.2d 1346 (7th Cir. 1988), *overruled on other grounds by Metropolitan Life Ins. Co. v. Christ*, 979 F.2d 575 (1st Cir. 1992), is factually similar in many respects to the present case, but highlights the difference between the language of FEGLIA and the policy at issue here.

In *Rollins*, the deceased was a federal civilian employee covered by FEGLIA. He was married to, and had children by, one woman. He then divorced her and married a second woman. According to the record, the second wife filed a petition for dissolution of the marriage on April 28, 1986, citing an "irretrievable breakdown." The couple were living apart, and the second wife had obtained a restraining order against Rollins, citing her fear that he would cause her personal injury. There was no written property settlement agreement, but the couple had made an oral agreement to divide their property. A final divorce hearing was set for July 14. On May 14,

20

Rollins committed suicide.

Rollins died without designating a beneficiary for his FEGLIA benefit. Both his second wife and his children by his first wife claimed the right to the insurance proceeds. The children argued that the second marriage "was over as a practical matter, with nothing but the formality of a hearing to technically dissolve it." 863 F.2d at 1349. The Court of Appeals did not disagree, but held that the proceeds nonetheless should be paid to the second wife as Rollins's widow:

> FEGLIA provides a rather simple priority of beneficiaries, without any reference to the common marital difficulties that often complicate real life, as in this case. We will not undertake the likely impossible task of trying to rewrite the statute to fairly provide for all eventualities. We agree that in spite of the total collapse of the marriage the defendant technically qualifies as the widow of the insured within the meaning of the statute.

*Id.*

Here, in contrast, there is no statute commanding a particular result, and an insurance policy that permits the exercise of discretion in determining the recipient of the benefits. Cases interpreting FEGLIA are thus of little utility in determining how to interpret that policy, or exercise that discretion; while FEGLIA sets forth a statutory mandate for a particular governmental program, it is not an expression of governmental policy generally or ERISA policy specifically.

### 3.     Whether the Policy Is Entirely Permissive

Having rejected Doris's argument that the policy imposes a strict hierarchy of beneficiaries, the Court must next consider Lorraine's argument that the proceeds could be paid under the policy to any beneficiary, or to the estate, in the unguided discretion of the insurer. The Court rejects that position as well.

Essentially, Lorraine's argument requires that the Court assume that the numerical ranking

21

of the different classes of beneficiaries is entirely meaningless. But it is highly unlikely that the numbering was merely for the sake of convenience, like the numbering of paragraphs in a long document; the list is very short, and indeed three of the four classes are described with a single word. In fact, the readability and organization of the policy would not be affected in the slightest if the language were removed.

The numbering must therefore have some other purpose. The only conceivable purpose, other than convenience and readability, is to create an ordinal sequence. Accordingly, while the meaning of the language is far from clear, it seems likely that it was intended to represent an order or preference of some sort, albeit not a mandatory one.

### 4.    Conclusion: The Policy Contains a "Permissive Hierarchy"

The policy thus contains both permissive language (the amount "will be paid to one or more of the following persons," but "we may instead pay all or part of that amount to your estate") and hierarchical language (the numerical list). Although the matter is hardly free from doubt, putting the two together, the Court concludes that the list constitutes a "permissive hierarchy": the proceeds generally (or ordinarily, or normally) will be paid to the classes of beneficiary indicated, in the order indicated, but the insurer need not do so in specific (or extraordinary, or abnormal) circumstances.[14] In other words, the discretion of the insurer is not unguided. While the policy does not establish a strict hierarchy—and as described above, it

---

[14] The use of the phrase "one or more" is ambiguous in this context: it could refer to multiple persons within a single class of beneficiaries (e.g., permitting payment to multiple children), or it could refer to all eligible persons (e.g., permitting payment to both a spouse and a child). The Court need not resolve the ambiguity here. Even if the policy permits the Court to split the proceeds among the spouse and the parents, it elects not to, for the reasons set forth below. Likewise, even if the Court could split the proceeds among Darren's parents and sister (as Lorraine has requested), the Court elects to adhere closely to the beneficiary classes, again for the reasons set forth below.

would have been easy enough for the insurer to do so—the enumeration of the various classes is not haphazard.

This raises two obvious questions: Under what circumstances would the ordinary hierarchy not apply? And is this one of those circumstances?

As to the first question, the policy is silent, and there is very little guidance from the backdrop of federal and state law. In general insurance terms, a "facility of payment" clause allows the insurer to pay to either the named beneficiary, to a member of a named class, or to any person found to be equitably entitled to the proceeds. *See* COUCH ON INSURANCE, § 61:14. The language at issue here may have been modeled after a "facility of payment" clause, and may be intended to serve the same purpose. *See Pressley v. Metropolitan Life Ins. Co.*, 729 F. Supp. 570, 571-72 (E.D. Mich. 1990) (insurer elected to pay to spouse under "facility of payment" clause which allowed insurer to pay to "wife, husband, mother, father, child or children"). But the Court has found no case interpreting the same or similar language under circumstances that would give relevant guidance here.

The most that the Court can conclude is that under the policy there are "extraordinary" circumstances where the "ordinary" hierarchy does not apply. Under ordinary circumstances, of course, the proceeds would be paid to the surviving spouse. The sole remaining question is whether this case is extraordinary enough to warrant an abnormal result.

### E.    The Award of Benefits under the Policy

There can be no question that Doris, as a matter of law, was the spouse of Darren at the time he died. That marriage, however, was very short—Doris filed for divorce less than two years after the wedding—and apparently unhappy. The couple had no children. As of the date of

23

Darren's death, they were living apart. There is no evidence of any attempts at reconciliation.

And the parties had not simply begun divorce proceedings; they had undertaken every step

necessary to effectuate a divorce, all the way through the entry of a court decree. The only thing

remaining for the divorce to become final was the passage of time; no further act, by husband,

wife, or court, was necessary.

Marriage, even a failed marriage, is hardly a technicality, and the Court gives substantial

weight to the fact that Doris was Darren's spouse at his death. But there was nothing left to this

marriage other than its legal status. Indeed, if Darren had died in an accident during the nisi

period, the Court would not hesitate to conclude that the fact that he died while still married was

simply a fortuity. The timing of his death was not, of course, a fortuity; he chose its precise

moment. Nonetheless, there is nothing in the record to suggest, and no reasonable basis to infer,

that the timing of his death had any relation at all to the payment of the proceeds under the policy.

It also appears that Darren and Doris intended to separate their financial affairs

completely, and to make a final arrangement to that effect. Unlike many such arrangements, the

Separation Agreement did not provide for ongoing financial obligations, such as the payment of

alimony. And while the Separation Agreement does not mention the life insurance benefit, Doris

does not make any claim of fraud or inequitable conduct, and it seems overwhelmingly likely that

neither Darren nor Doris was aware of its existence at the time the Agreement was executed. The

Court therefore has no difficulty concluding that the parties *intended* a complete financial

separation, even if they did not achieve it.[15]

---

[15] The Court is not resting its decision on any purported waiver by Doris in the Separation Agreement of her rights to the life insurance benefit. As noted, the agreement did not mention that benefit. *See Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc. Retirement Income Trust*, 191 F. Supp. 2d 223, 233 (D. Mass.

The Court's decision is informed in large part by equitable considerations as to the actual, as opposed to legal, status of the marriage. Relying upon such considerations places the Court on the brink, if not over the edge, of a very slippery slope. Clearly the Court would not find it appropriate or desirable to delve into the details of the marital or parental relationships, or otherwise to ascertain who was more "deserving" of the proceeds in any broader sense. Nonetheless, in some circumstances, there might be other equitable factors—for example, reasonable reliance by the spouse of the existence of the policy, or potential financial hardship—that might be appropriate to consider in order to avoid a harsh result.[16] In any event, it is sufficient for present purposes to observe that the decision rests on relatively objective factors, such as the short duration of the marriage, its imminent demise, and the agreement between the parties, and that no further inquiry is necessary.

In summary, the marriage was exceedingly short, and the parties to it had expressed their unequivocal intention to end it. They had made, or at least intended to make, a final separation of

---

2002) (releases of ERISA pension benefits not effective where, among other things, they never mentioned the plan and the ones that did mention the plan were vague). In the context of a waiver as part of a divorce decree, one court has stated that the waiver will be valid if "upon reading the language in the divorce decree, a reasonable person would have understood that she was waiving her beneficiary interest." *Clift v. Clift*, 210 F.3d 268, 271 (5th Cir. 2000). *See Fox Valley*, 879 F.2d at, 251-52 (waiver of ERISA death benefit through court-approved marital property settlement); *Flinkstrom*, 303 F. Supp. 2d at 40-41 (waiver of ERISA life insurance benefit through marital agreement incorporated into final judgment of divorce).

[16] Where policy language is clear, courts have often enforced it strictly, even where that language may lead to a seemingly inequitable result. Thus, for example, in *Mangene v. Aetna Life Ins. Co.*, 328 A.2d 720 (Conn. C.P. 1974), a non-ERISA case decided under Connecticut law, the insured, who did not have a surviving spouse or child, died without designating a beneficiary. The policy provided that the proceeds would be paid under such circumstances to the parents of the insured first, and then to his siblings. The decedent's brother alleged that the father had abandoned the insured and his family more than thirty years earlier, "renounced his relationship as father and his responsibilities of fatherhood," and had "never since acted as or resumed the duties and obligations of being father . . . ." *Id*. at 721. The court nonetheless ordered that the proceeds be paid to the father, on the grounds that the "[father's] paternal relationship to the insured upon his death was factually and legally intact." *Id*. at 724.

their financial affairs.  Therefore, a departure from the ordinary hierarchy of beneficiaries is appropriate in this case.  Rather than uncouple its decision entirely from the categories in the policy, the Court will award the proceeds to the next listed class of beneficiaries.  Because Darren had no children, the next relevant class is that of "parent."  Lorraine and Donald shall therefore receive the proceeds in equal proportions.  This result is rational, consistent with the policy and the goals of ERISA, and will aid the equitable and uniform development of the federal common law.

Several matters remain to be addressed.  First, the Court's decision does not precisely follow any party's request for relief.  As noted, Lorraine's claim to MetLife was submitted as administrator of the estate, and requested that the proceeds "be equally distributed to the decedent's mother, father and sister"; her amended complaint seeks a declaratory judgment instructing MetLife to "distribute the life insurance proceeds to the Estate of Darren Forcier and not to decedent's spouse, Doris Forcier."[17]  But there can be no doubt that the Court has the power to grant different relief than what the parties have requested; under Fed. R. Civ. P. 54(c), except in cases of default, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."

Moreover, while the Court clearly has the discretionary power under the policy to pay the proceeds to the estate, there are substantial reasons why that result is not desirable here.  For

---

[17] As noted, two claims were filed with MetLife:  one by Doris and one by Lorraine, as administrator of the estate, with a request that the proceeds be paid to the two parents and the sister.  MetLife raised no procedural objections as to either claim, whether in terms of form, timeliness, or otherwise.  For these purposes, the Court finds that sufficient notices of claim have been provided by all parties under the policy.

26

example, a payment to the estate is likely to trigger yet another round of litigation. Under Massachusetts law, Doris as spouse would probably be entitled to take $200,000 against the estate, plus half of the remaining personal and real property. *See* Mass. Gen. Laws ch. 190, § 1. This, in turn, would in all likelihood lead to litigation as to whether Doris's written waiver of her rights in the estate under the Settlement Agreement—which is poorly drafted, ambiguous, and contains typographical errors—included a waiver of her rights to these proceeds.[18]

Finally, the relief requested by Lorraine included a direct payment of one-third of the proceeds to Dionne Waterman, Darren's sister. Because the Court has decided to award the proceeds to the third class of beneficiaries under the policy—that is, to the parents—it is not making any award to the sister, who apparently is the sole member of the fourth class of beneficiaries. The Court's decision is intended to adhere closely to the permissive hierarchy of beneficiaries, in order to reflect the apparent intent of the signatories to the policy, to promote predictability and ease of administration in future cases, and to minimize reliance on equitable considerations. Nothing in this opinion, however, is intended to prevent or discourage Darren's parents from transferring a proportionate share to their daughter under such circumstances (with due regard to appropriate gift tax and other consequences) as they deem fair or just.

In summary, under the federal common law of ERISA, the Court concludes that (1) decedent Darren Forcier, the participant in an ERISA-governed life insurance benefit plan, failed to designate a beneficiary; (2) the circumstances do not mandate returning the matter to the

---

[18] Among the uncertainties in such litigation is the legal impact of the statement in the February 26, 2005 opinion of the Associate Justice of the Probate and Family Court that "[h]aving found that the Agreement is enforceable, I am bound to enforce the provision of the Agreement wherein Mrs. Forcier waived her rights in the estate of Mr. Forcier and waived her right to act as the administrator of his estate." (Exhibit H).

insurer for decision; (3) the terms of the policy create a "permissive hierarchy" requiring payment of the death benefit to the spouse, children, parents, or siblings of the participant, in that order, or to the estate, unless extraordinary circumstances exist; (4) while ordinarily such benefits would be paid to the spouse, the unusual circumstances present here make it appropriate to make payment to the persons in the next hierarchical class; and (5) because Darren had no children, the proceeds should be paid to the members of the next hierarchical class, his parents Lorraine and Donald Forcier.

## IV.   Conclusion

For the foregoing reasons, judgment shall be entered for Lorraine Forcier and against Doris Forcier.  The proceeds of the life insurance policy issued by Metropolitan Life Insurance Company, which have been previously paid into this Court shall be paid, with accrued interest, in equal portions to Lorraine Forcier and Donald Forcier.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: December 28, 2005